UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| Cheryl Kuppler, Bradshaw Family Farms, LLC by John Bradshaw Kiick, Connie Schneider, Fred Alsene, James D. Lantz, Keith Cornwell, Kent W. Cornwell, Matthew Hughes, Progressive Prairie Inc. by Matthew Hughes, Donald Cook, Keith A. Chenoweth, Chenoweth Land Trust by Kevin Chenoweth, Kevin Chenoweth, Ronald Egan, Olson Farm, Inc. by Paul Olson, and Mary J. Meginnes, | Civil Action No. _____ |
|           Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | ON ALL COUNTS |
| Syngenta Corporation, Syngenta Crop Protection AG, Syngenta AG, Syngenta Crop Protection, LLC., Syngenta Biotechnology, Inc., and Syngenta Seeds, Inc., | |
|         Defendants. | |

## **COMPLAINT**

Plaintiffs bring this action individually against Syngenta AG ("Syngenta AG"), Syngenta Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp"), Syngenta Crop Protection, LLC ("Crop Protection LLC"), Syngenta Biotechnology, Inc. ("Syngenta Biotech") and Syngenta Seeds, Inc. ("Syngenta Seeds") (Syngenta AG, Crop Protection AG, Syngenta Corp, Crop Protection LLC, Syngenta Biotech and Syngenta Seeds are

1

sometimes hereinafter collectively referred to as either "Defendants" or "Syngenta") and state as follows:

## NATURE OF THE ACTION

This action comes before the court after Syngenta et al, released the genetically modified trait MIR-162, also known as Agrisure Viptera ® to the market. The industry recognizes that premature commercialization can cause trade disruptions and financial harm to corn producers and others in the industry. In 2010, Syngenta released Viptera ® into the market, knowing that important foreign markets, such as China, had not approved of the new trait.

In an effort to maximize on their profits with this new trait and patent, Syngenta chose to make the irresponsible decision to commercialize Viptera ® for the 2011 crop year. Syngenta was warned by many industry participants about the devastating effects this premature commercialization could have. But Syngenta continued marketing Viptera®.

In November 2013, U.S. corn was sent to China and when China found that the shipment contained trait MIR162, China rejected the entire shipment of U.S. corn. This prompted industry participants to again warn and urge Syngenta to immediately cease commercialization of Agrisure Viptera®. Industry participants also warned Syngenta not to commercialize a new genetically modified trait, Agrisure Duracade[TM]. This had no effect on Syngenta. At this time, the National Grain and Feed Association quantified the economic harm at $1 billion to $2.9 billion dollars.

Syngenta continued to commercialize both Agrisure Viptera ® and Agrisure Duracade[TM] causing more harm to the corn producers, and generating more profit for Syngenta. Syngenta actively misled farmers and industry participants about the importance of the Chinese market, the

timing of approval, and the ability to separate the Viptera® corn to avoid further shipment rejections.

But in February of 2014 another shipment of U.S. corn was sent to China, and again, the unapproved trait was detected and China rejected the entire shipment. In addition to rejecting the current shipment, China decided that no more U.S. corn would be accepted without a certification that there was no MIR162, Viptera ® trait in the shipment. This feat is nearly impossible with the way the U.S. corn industry operates. China, projected by the USDA to be the largest expert market for corn by 2020 became a lost market for U.S. corn producers and industry participants, because of Syngenta's greedy actions.   Through this complaint, Plaintiff seeks compensation for losses which they have suffered due to Syngenta's greedy and irresponsible actions, and punitive damages for Syngenta's inexcusable and shocking behavior.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1332, and 15 U.S.C. §1125(a) (Lanham Act) and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

2.      This Court has personal jurisdiction over Defendants because Defendants regularly and systematically conduct business in this District, including the marketing and sale of Viptera and Duracade corn to farmers within this District. Moreover, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc. are entities that have registered to do business in and are subject to service of process in Illinois.

3.      Venue properly lies in this District pursuant to 28 U.S.C. §1391(b) and (c), because Defendants have and continue to market, sell, or otherwise disseminate Viptera and Duracade corn in this District.

4.      This action is appropriately filed within this Division of the Central District of Illinois as the predominant portion of these cases arose from the Illinois counties of Fulton, McLean, Woodford, Putnam, and Tazewell Counties.

5.      The Judicial Panel on Multidistrict Litigation has consolidated numerous similar actions alleging the same claims against the same Defendants for coordinated pretrial proceedings in MDL No. 2591; In re: Syngenta AG MIR162 Corn Litigation (D. Kan.).

6.      Plaintiffs anticipate the Judicial Panel on Multidistrict Litigation also will transfer this action to MDL No. 2591. The Hon. John Lungstrum of the District of Kansas, therefore, will have jurisdiction over this action as the designated transferee court.

7.      Without waiving the right to their claims being transferred to their home Districts for trial, under 28 U.S.C. § 1407, Plaintiffs assert that venue also is proper in the District of Kansas for coordinated pre-trial proceedings in MDL No. 2591, under 28 U.S.C. §§ 1391 and 1407.

## PARTIES

*Plaintiffs:*

8.      Bradshaw Family Farms, LLC  by John Bradshaw Kiick farms in Macon County, Illinois. He planted approximately 114 acres of corn in 2013 and planted approximately 123.4acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

9.      Cheryl  Kuppler is a citizen of Illinois who farms in Warren County, Illinois. She planted approximately 0 acres of corn in 2013 and planted approximately 16.6 acres of corn in 2014.  She has not knowingly planted Agrisure Viptera®. She has not knowingly planted Agrisure Duracade™ corn.

10.    Connie Schneider is a citizen of Illinois who farms in McLean County, Illinois. She planted approximately 123 acres of corn in 2013 and planted approximately 114acres of corn in 2014.  She has not knowingly planted Agrisure Viptera®. She has not knowingly planted Agrisure Duracade™ corn.

11.    Fred Alsene is a citizen of Illinois who farms in McLean County, Illinois. He planted approximately 204 acres of corn in 2013 and planted approximately 519acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®.  He has not knowingly planted Agrisure Duracade™ corn.

12.    James D. Lantz is a citizen of Illinois who farms in Marshall County, Illinois.  He planted approximately 134.95 acres of corn in 2013 and planted approximately 139.11acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

13.    Keith  Cornwell is a citizen of Illinois who farms in Tazewell County, Illinois. He planted approximately 578.75 acres of corn in 2013 and planted approximately 578.75acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

14.    Kent W. Cornwell is a citizen of Illinois who farms in Tazewell County, Illinois. He planted approximately 578.75 acres of corn in 2013 and planted approximately 578.75 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

15.    Matthew Hughes is a citizen of Illinois who farms in McLean County, Illinois. He planted approximately 123 acres of corn in 2013 and planted approximately 114 acres of corn

in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

16.    Progressive Prairie Inc. by Matthew Hughes farms in McLean County, Illinois. He planted approximately 698 acres of corn in 2013 and planted approximately 573 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®. He has not knowingly planted Agrisure Duracade™ corn.

17.    Donald Cook is a citizen of Illinois who farms in Schuyler County, Illinois. He planted approximately 49.7 acres of corn in 2013 and planted approximately 49.5 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®.  He has not knowingly planted Agrisure Duracade™ corn.

18.    Keith A. Chenoweth is a citizen of Illinois who farms in Fulton County, Illinois. He planted approximately 412.55 acres of corn in 2013 and planted approximately 365.86 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®.  He has not knowingly planted Agrisure Duracade™ corn.

19.    Chenoweth Land Trust, by Kevin Chenoweth, farms in Fulton County, Illinois.  It planted approximately 88.3 acres of corn in 2013 and planted approximately 71.64 acres of corn in 2014.  It has not knowingly planted Agrisure Viptera®.  It has not knowingly planted Agrisure Duracade™ corn.

20.    Kevin Chenoweth is a citizen of Illinois who farms in Fulton County, Illinois.  He planted approximately 393.35 acres of corn in 2013 and planted approximately 347.86 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®.  He has not knowingly planted Agrisure Duracade™ corn.

21.    Ronald Egan farms in Scott County, Illinois.  He planted approximately 0 acres of corn in 2013 and planted approximately 54 acres of corn in 2014.  He has not knowingly planted Agrisure Viptera®.  He has not knowingly planted Agrisure Duracade[TM] corn.

22.    Olson Farm, Inc, by Paul Olson, a citizen of Illinois, farms in McDonough County, Illinois.  It planted approximately 165.6 acres of corn in 2013 and planted approximately 193.7 acres of corn in 2014.  It has not knowingly planted Agrisure Viptera®.  It has not knowingly planted Agrisure Duracade[TM] corn.

23.    Mary J. Meginnes is a citizen of Illinois who farms in Marshall and Woodford Counties in Illinois.  She planted approximately 194 acres of corn in 2013 and planted approximately 208 acres of corn in 2014.  She has not knowingly planted Agrisure Viptera®.  She has not knowingly planted Agrisure Duracade[TM] corn.

## FACTUAL ALLEGATIONS

24.    In July 2010, Syngenta executives discussed methods for detecting genetically modified traits and shared "one of the stories on MIR162 for why we need a GMOD [genetically modified organism detection] strategy."  That story noted that "[a]symmetric approval of Agrisure Viptera in one territory and other territory may affect the free flow of product trade." Email from Jingwen Chen to Alejandro Tozzini et al., dated July 20, 2010.

25.    Syngenta discussed, but rejected, issuing strip test kits to processing facilities and other grain handlers to reduce the risk of MIR162 entering facilities that exported to unapproved markets despite the fact that the test kits cost approximately one dollar each. Nor did it provide another test method to farmers or grain handlers as part of a required stewardship program.

26.     Syngenta also could have contractually required that Viptera® growers adhere to stringent practices that would have decreased the likelihood of contamination. Syngenta did not, however, because to do so would have drastically reduced or eliminated sales of that product.

27.     Instead, and contrary to requiring isolation, Syngenta Seeds gave away free bags of Viptera to farmers as part of a campaign to encourage Viptera® growers to grow Viptera® side-by-side with other corn to compare performance. *See Syngenta,* 820 F. Supp. 2d at 958.

28.     Syngenta ***expected*** the Viptera® corn to cross-pollinate with non-Viptera corn and, according to Charles Lee, told farmers to consider the adjacent corn Viptera® corn. *See* Charles Lee Deposition (9/7/2011) (*Bunge*) at 221-223. Yet, there was no contractual requirement for growers to take measures to prevent such cross-pollination in their own fields, to segregate Viptera® from non-Viptera® corn or to prevent contamination of other farmers' fields.

29.     In fact, Syngenta advised at least one grower that he had no obligation to tell neighboring corn farmers or grain originators that he had planted Viptera®. This advice was in response to the farmer's concern that he might be liable if his Viptera® corn cross pollinated with his neighbor's corn.

30.     Moreover, upon information and belief, in addition to the acreage upon which Agrisure Viptera® (and later, Duracade™) have been grown from sales of those products, Syngenta has grown on land within the United States corn containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers. This additional growth further increased the presence of MIR162 within U.S. agriculture and the widespread, pervasive contamination which has caused disruption of trade in U.S. corn with China.

31.     Syngenta knew the risks. In a June 2010 "Risk Management Report," Syngenta recognized that "MIR162 [would be] detected as unapproved trait" as a consequence of large

scale production "before all import approvals are in place." The report recognized that increased production in 2010 of corn containing MIR162 increased the "likelihood of MIR162 being detected as [adventitious presence] in an export channel." Syngenta classified the impact of this risk as "high." Risk Management Report dated June 2010.

32.    Syngenta's commercial sales of Agrisure Viptera® for planting, growing, and harvest in 2011 reached across the United states, covering nine hundred nineteen (919) counties and thirty-eight (38) states. Despite the pervasive presence of Agrisure Viptera® and Syngenta's knowledge of the risks, Syngenta did not require growers to comply with the kind of strict measures Syngenta knew were minimally necessary in order to even have a chance at containment.

33.    Syngenta's professed "channeling" efforts, which could and should have been in place well prior to harvest in order to direct Agrisure Viptera® away from markets lacking import approval, also were wholly – and purposefully – inadequate.

34.    In its 2007 MIR162 Deregulation Petition, Syngenta represented that a lack of Chinese approval would not pose a problem for U.S. farmers because:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide) . . . [T]hese procedures are not hypothetical.

35.    Syngenta's "stewardship" program, however, did indeed present hypothetical" and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

36.    Contrary to representations in its MIR162 Deregulation Petition, Syngenta did not, on information and belief, institute a "wide ranging grower education campaign" through its

Stewardship Agreements, Stewardship Guides or otherwise, and certainly did not do so in a manner that would be meaningful and effective.

37. On information and belief, none of Syngenta Seeds' Stewardship Agreements with growers contained any details on Syngenta's stewardship program. Instead, the agreement provided that growers should comply with the "most current" version of a "Stewardship Guide," which might or might not be given to them when they received the product, and was subject to unilateral change at any time via modification to a website. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 08/2009) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 03/14/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 05/11/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 06/05/2013) at 1.

38. In other words, Syngenta's "stewardship" program for Agrisure Viptera® depended, at the outset, on thousands of individual farmers across the country locating and understanding a Stewardship Guide which they may well not have been provided at the time of signing the Stewardship Agreement or receiving the product.

39. Moreover, while the Stewardship Agreements contained a provision for "channeling," they made no mention of China.

40. The 2009 version of the Stewardship Agreement provided that the grower "agrees to: Channel grain produced from seed to appropriate markets to prevent movement to markets where the grain has not received regulatory approval for import." It does not, however, identify China as one of those markets. Rather, the agreement states that: "Grain harvested from corn hybrids containing Agrisure Technologies . . . may not be fully approved for grain export to **Japan or the European Union**" and that "grain from hybrids that do not have the appropriate import approvals from **Japan and the European Union** must be directed to domestic uses and

away from export channels." Syngenta Seeds, Inc. Stewardship Agreement (Revised 08/2009) at 2 (emphasis added). There is no reference to any other unapproved markets, including China.

41.     The March and May 2011 versions of Syngenta Seeds' Stewardship Agreement said – and did not say -- the same thing.

42.     Syngenta Seeds' 2013 version of the Stewardship Agreement removed the reference to Japan and the European Union, but even then did not mention China.

43.     None of the agreements contain any instruction on how the grower was supposed to "channel."

44.     And Syngenta knew or should have known that bare reference to channeling (and at that, without reference to China), was ineffective. Syngenta itself has stated: "Contracts are not carefully reviewed or understood."

45.     In any event, and to the extent other versions of the Stewardship Agreement (or Stewardship Guide) do reference China, the concept of "channeling" by thousands of individual corn farmers under Syngenta's non-existent or – at minimum, inadequate – "stewardship" program, was certain to fail.

46.     "Channeling" can only work if all grain handlers and others in the supply chain are engaged in that endeavor. For example, BIO recognizes that a realistic assessment of conditions related to handling, distributing, processing and testing products must engage the various stakeholders.

47.     Upon information and belief, Syngenta did not obtain channeling commitments from supply chain participants, took no further action to create a marketing plan or channeling mechanism or to coordinate with grain handling, export and other post-harvest firms, to ensure

that Agrisure Viptera® corn was not directed to markets for which regulatory approval had not been received, including China.

48.     This failure was purposeful. Syngenta made a decision that no special provisions would be made for grain redirection. In the summer of 2010, David Morgan agreed – reluctantly – to approve sending MIR162 seed planted prior to Japanese approval to a feedlot instead of placing it into the grain channel if Syngenta did not have to pay for it: "To be clear, if we can do this with zero cost and minimal effort and this keeps everyone 'quiet,' then why not? If otherwise then I personally don't care about channeling." Email chain including David Morgan and Jack Bernens dated June 18, 2010.

49.     Not only did Syngenta decide it would not take measures for channeling Agrisure Viptera®, Syngenta sought to ***stop*** exporters and grain elevator operators from attempting to "channel" Agrisure Viptera® away from China. Specifically, Syngenta brought a lawsuit against Bunge, a grain elevator operator, who refused to accept Agrisure Viptera® corn because that operator exported corn to China.

50.     On August 17, 2011, Syngenta issued a letter to Agrisure Viptera® growers expressing disappointment that Bunge and Consolidated Grain & Barge reportedly would "not be accepting grain with the Agrisure Viptera® trait." Syngenta recommended to growers that they simply "[d]eliver[] to elevators accepting grain with the Agrisure Viptera® trait." Syngenta made no mention that these elevators should channel the grain to markets in which that trait had been approved.

51.     Syngenta Seeds sued Bunge in *Syngenta v. Bunge* complaining that Bunge could not refuse to accept at its grain elevators Agrisure Viptera® corn. Bunge had posted notices at its grain elevators that it would not accept Agrisure Viptera® corn because the MIR162 trait was

not then approved in China, that China had a zero tolerance policy regarding non-approved GMO events such as MIR162, and, that Bunge had significant contracts with Chinese markets which it wanted to fulfill.

52.     Syngenta Seeds filed the suit seeking an injunction to require it to accept the Agrisure Viptera® corn despite: (i) its earlier representations in the MIR162 Deregulation Petition that corn grown with its MIR162 trait would be channeled away from export markets which had not yet approved of its importation; (ii) the requirement in its Stewardship Agreement with growers who had purchased Agrisure Viptera® seed requiring them to channel their harvested grain away from export markets which had not yet approved the importation of MIR162 corn; and (iii) the protocols referenced above approved by the Biotechnology Industry Organization and other organizations of which Syngenta was/is a member requiring consultation with industry stakeholders and not commercializing approved traits without major market approval.

53.     At the end of the 2010 crop year in August 2010, China had already become the seventh largest importer of U.S. corn. *See Syngenta*, 820 F. Supp. 2d at 860-61. Thereafter, in the spring of 2011, Bunge had sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012. *Id*.

54.     The Court in *Syngenta v. Bunge* denied Syngenta Seeds' requested injunction on September 26, 2011. In denying the requested injunction, the Court found that it was foreseeable that China would not approve importation of MIR162 during the 2010-2011 crop year, that during that year U.S. exports to China might be significant, and that Syngenta Seeds had caused the very harm of which it complained. The Court refused to shift the risk to Bunge for

commercializing Agrisure Viptera® prior to receipt of approval from China. Specifically, the

Court in that case concluded, *inter alia*, that:

> [a]t least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera®], thought significant, [were] the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable . . . . (*Syngenta*, 820 F. Supp. 2d at 988)

55.    The Court also concluded that:

> no reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet approved for import to China. That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant. Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets. I reject Syngenta's request that I shift that risk, instead, to Bunge . . . . (*Id*. at 990)

56.    In addition, in addressing the public interest element for injunctive relief, the

Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta:

> I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals . . . . (*Id.* at 992)

57.    The Court also found that in the late summer and fall of 2011, exporters other

than Bunge, including Cargill and Archer Daniels Midland ("ADM"), had also refused to accept

Agrisure Viptera® at some of their facilities due to export market issues such as the failure of

Syngenta to receive approval from the European Union. *Id.* at 962.

***Syngenta's Irresponsibility and Misrepresentations Moving Into The 2012 Crop Year:***

58.     Despite the risk of contamination and movement of Agrisure Viptera into export markets, Syngenta continued its course and sold even more Agrisure Viptera® for planting in 2012, further increasing those risks.

59.     And Syngenta expanded sales of Agrisure Viptera® even as China was dramatically increasing imports of U.S. corn and was projected to be the largest importer of U.S. corn by the year 2020.

60.     In 2011, Syngenta was selling Agrisure Viptera® for the next growing season, 2012.

61.     Syngenta was concerned. If grain handlers like *Bunge* refused to take Agrisure Viptera®, the lack of approval from China might reduce its sales.

62.     On June 29, 2011, Syngenta's Head of Industry Relations warned several Syngenta executives:

> All, just want to continue to let you know the questions about MIR162 continue to increase Both on EU and China. Today at NGFA meeting [a Cargill executive] said his export business is really wound up about China and MIR162 not being approved.  I predict we are going to have some rough water around MIR162 until China and EU are approved.

Email from Jack Bernens to Charles Lee, Sarah Hull, and David Morgan dated June 29, 2011.

63.     On July 1-5, 2011, Syngenta's Sarah Hull and others exchanged emails that grain exports were beginning to erect signs announcing their refusal to accept Viptera® from growers because of the threat posed by the lack of approval from China.

64.     On July 2, 2011, Syngenta's Head of Industry Relations sent an email to Syngenta management, stating: "[A]s you know I have been warning of this pending potential development for some time . . . China has become a substantial market and we could see this was going to happen." Email from Jack Bernens to Grant Ozipko dated July 2, 2011.

65. Syngenta also knew by July 2011 that China would not change its zero-tolerance policy. On July 5, 2011, Syngenta's head of Corporate Affairs China informed the management team: "With regard to the MoA officials . . . they reiterated . . . that at present stage, MoA will not change the GMO safety certificate (for processing) issuing system." Email from Wang Sean to Andrew McConville and others dated July 5, 2011.

66. Syngenta, however, chose not to inform growers and the grain industry of the growing danger. Instead, it crafted a plan to mislead grain handlers and growers to believe that Syngenta would have import approval from China by the time Viptera® was harvested despite all indications to the contrary. The purpose of this plan was to sell more Viptera®.

67. On July 5, 2011, Sarah Hull emailed:

Not sure on the approval timeline . . . We get daily questions from the other grain traders about China and EU (Brazil trade) approvals . . . Most important is that we get them comfortable that the approval is close so they don't not only tell farmers not to bring their 162 varieties to them but also not to buy the varieties for planting next year.

Email from Sarah Hull to Ponsi Trivisvavet dated July 5, 2011.

68. United States Grains Council President, Tom Dorr, in a memorandum dated August 2, 2011 to "Seed Technology Members" and emailed to Syngenta, stated that 'the current situation regarding the commercialization of unapproved events in China has raised industrywide concern about potential near and longer-term disruption to US corn exports in China." In the same memorandum, he referred to China as a "major corn importer."

69. By at least early July 2011, Syngenta was already managing its message and had scripted its responses.

70. Among other things, Syngenta launched a "blame the grain trade" campaign. On July 7, 2011, Syngenta's Sarah Hull stated:

> Channeling is exactly what these guys [grain handlers] need to accept as the way forward in general. Will be interesting to hear what Cargill says since they feel they are better at managing logistic challenges than anyone else. I think we have to find the right balance of making this a 162 problem versus an evolutionary challenge of global grain trade and adjust our actions to reflect the latter.

Email from Sarah Hull to David Morgan and others dated July 7, 2011.

71.     Syngenta remained focused on its bottom line. Addressing a suggestion that Syngenta work "with the grain channel to avoid issues with introductions of new trait technologies," a Syngenta executive responded: "(you don't need to spend a lot of time on it) but what may not have been driven home yet is how much this potentially will cost Syngenta, how much the China thing has and IS costing Syngenta, and what it's done to sales/field perceptions." Email exchange between Jill Wenzel and John Fisher dated October 12, 2011.

72.     Syngenta internally communicated its "Yields Without Borders Program" and its "Top 10 Tactics to Energize Sales Force and Leverage Grain marketing Channel to Secure Sales." *See* Syngenta document entitled "The Role of Grain marketing for Future Trait Technologies." Part of this program was to provide regular (and misleading) updates "on progress and plans for China trait approval and to drive trait acceptance." *Id.*

73.     This was in response to, among other things, complaints by producers that they were not informed properly about issues with Agrisure Viptera® when they ordered seed. *Id.*

74.     Syngenta's goal was, among other things, to develop a "strategy moving forward to neutralize grain-marketing related barriers to acceptance of Agrisure Viptera." *Id*

75.     Syngenta's objectives included "introduction of new trait technologies to maximize IP [intellectual property] protection window and realize income sooner on R&D investment" and to address Syngenta's "black eye" in regard to "issues of technology acceptance and grain marketing." *Id.*

76.    In order to encourage further sales and planting of Agrisure Viptera®, Syngenta, by at least August 2011, was representing to stakeholders, including corn growers, that Syngenta would obtain China's approval by March 2012. *See, e.g.* Syngenta Letter to Viptera Growers dated August 17, 2011 (stating "we are still awaiting import approval from China, which we anticipate in late March 2012" and that Chinese approval is "expected late March 2012").

77.    As one of Syngenta's business partners observed: "communication, communication, communication, over and over to growers is needed, even if it is repetitious information is needed to hold Agrisure Viptera orders . . . [and to create] pull through interest in seeds tock orders for planting the 2013 crop. If we say March enough, there should be no issue in ordering seed stock and seed companies will have confidence in the March date." Email from Don Kestel dated November 30, 2011.

78.    Syngenta, however, did not have a reasonable basis to believe that approval from China would be received in March 2012 and did not itself expect approval by that time.

79.    On July 8, 2011, the Head of Syngenta's Southeast Asian Territory wrote to Syngenta's Head of Corn for North America:

**Viptera China:** I'm really concerned whether Q1/Q2 2012 is still achievable. Could we talk on this still?

Email from Trivisvaret Ponsi to Charles Lee dated July 8, 2011.

80.    Indeed, Syngenta's approval submissions to China included insufficient, incorrect and/or incomplete information, resulting in multiple additional submissions, and also included significant delays by Syngenta in providing standard information. For example, Syngenta did not submit PCR detection methods until January 10, 2011, and had to redeliver the PCR detection method on May 16, 2011, because the first submission was unclear. This information was a required precursor to testing in China, which may take – and is expected to take – months.  On

June 22, 2011, Syngenta sent a letter of correction regarding mislabeling of samples. Testing did not begin in China until June 24, 2011. Testing results are known requirements of completed applications. Even after an application is complete, review and deficiency notices, requiring correction, are not atypical but expected.

81.     In a July 6, 2011 email to Syngenta Executive Charles Lee, Lisa Zannoi admitted: "We had a year delay due to an internal restriction on shipping seeds to China needed to start the field testing." Email from Zannoni to Lee dated July 6, 2011.

82.     Before, but at least as of July 2011, Syngenta knew it could not expect approval by March 2012.

83.     Syngenta's own employees recognized that approval would take significantly longer.

84.     Brian Walsh emailed Katie Gutzmann on July 1, 2011 that Agrisure Viptera® would not receive import approval from China "for a few years yet." Email from Brian Walsh to Katie Gutzmann dated July 1, 2011, Mr. Walsh continued: "The good news is that most of Monsanto's new traits aren't approved either . . . All other major countries approved Viptera." *Id.*

85.     In further discussion on this topic on July 5, 2011, Quinn Showalter asked: "Do you have any insights regarding when [Monsanto] might get approval . . . If they aren't being restricted by [Consolidated Grain and Barge], it may be due to an anticipated approval vs. ours which I believe is anticipated in 2014." Email from Quinn Showalter to Araba Miloud dated July 5, 2011.

86.     Syngenta received field trial and safety test results in October and November 2011, respectively.   Syngenta submitted these results in a now-completed application on

November 9, 2011. At that point also, Syngenta knew or clearly should have known that it would not have approval by March 2012.

87.    As of May 2012, China's Ministry of Agriculture had reviewed Syngenta's application and had rejected it for deficiencies including all applicable safety analyses. Syngenta submitted another application in June 2012.

88.    In addition, on information and belief, Syngenta sought approval to cultivate MIR162 in, as well as import MIR162 to China. *See* Reuters "Update 1 – Syngenta confirms it applied to cultivate GMO corn in China" (Oct. 8, 2014)

89.    Upon information and belief, China has more severely restricted the right to cultivate bio-engineered crops than to import them, has not previously allowed any such cultivation by a foreign firm without Chinese participation, and has taken significantly longer to approve cultivation applications than importation applications, all of which may have materially delayed import approval.

90.    Syngenta was projecting that cultivation approval would not be obtained until 2016.

91.    Syngenta continued to downplay the importance of China and misrepresent the status of China's approval for the purpose of increasing sales of Agrisure Viptera®.

92.    Syngenta was far more focused on a potential loss of profits than it was on the risk of trade disruption caused by Agrisure Viptera®.

93.    Syngenta was analyzing the potential that Viptera® purchasers might return seed, and was looking at its prior experience in 2007 when it commercialized MIR604 prior to Japan approval. Syngenta's Product Lead for Commercial Traits took glee at the fact that a U.S. seed shortage would work in Syngenta's favor, forcing growers to "roll the dice" with Viptera:

> One heads-up from today's Agrisure Viptera core team call – approx. 750,000 of our approx. 1MM units are already ordered and we anticipate the remainder will be ordered by year's end. The industry- wide short supply of seed will work in our favor. . . .  Hence key business issue is more the black-eye we now have, vs. actual impact on sales. . . .
> **The issue will be if they [growers] return it, they likely won't be able to replace it. Poor things will have to roll the dice.**

Email from Jill Wenzel to John Fisher and Jim Gresham dated November 11, 2011.

94.     As Syngenta continued to make its misrepresentations and the presence of Agrisure Viptera® continued to spread, so did the risk of contamination of the U.S. corn supply with MIR162 – and the risk of market disruption. And Syngenta knew it. On July 11, 2011, Syngenta's Head of Global External Affairs, Sarah Hull, emailed other Syngenta executives regarding a plan devised with Syngenta's Michael Mack, to convince China to speed up its approval. Mr. Mack "want[ed] the Chinese to know that every ship carrying corn into China this fall will have 162 in it at some level." Email from Sarah Hull to Charles Lee (cc: David Morgan) dated July 8, 2011. Ms. Hull asked for information to verify numbers supporting that message:

> I need to pull some numbers together to make this a fact-based argument and wondered who could help me.
>
> We know that US plantings of [MIR]162 = 540,000 bags, representing 1.6% of the total corn market. I assume this is consistent with your citing ¼ billion bushels of Viptera grain is in fields today, but will you verify these facts? *Id.*

95.     Ms. Hull acknowledged that (contrary to earlier representations to the USDA that MIR162 could be effectively channeled like specialty maize), the ability to channel in a "closed loop" system is much different than a commodity crop. She noted: "I know we need to be careful not to undermine our position that we can successfully grow products in closed loop systems such as Enogen [corn developed by Syngenta for ethanol production], but I think we have to do what we can to get China to speed up this review. *Id.*

21

96.     The plan was for Syngenta to compare prior Syngenta contamination incidents (MIR604 and Bt10 corn) with the presence of MIR162 in the U.S. corn supply in order to show with dispersion modes "that under 0 tolerance even very little in the system had extensive hits." This, Ms. Hull said, should convince U.S. Government officials to convey to Chinese officials the need to approve MIR162 "or put US corn trade at serious risk." *Id.*

**Syngenta's Continued Deception Regarding China's Approval Of MIR162:**

97.     Syngenta continued its deception regarding the status of approval from China throughout 2012.

98.     Despite knowing that its incomplete and delayed regulatory filings with China assured that Syngenta would not obtain import approval for Viptera by March 2012, Syngenta nevertheless instructed employees to tell grain handlers: "We are still on schedule to obtain approval from China by March of 2012 . . . we have not received any indication that China approval will be delayed." Email from March Sather dated January 2, 2012.

99.     After the first quarter of 2012 had passed without approval from China, Syngenta told its employees to "**verbally**" (emphasis in original) communicate that Syngenta "continue[s] to anticipate that this approval will be received shortly." Email from Lori Thomas to DL NAFTA list serve et al., dated April 8, 2012.

100.    On or about April 10, 2012, Sarah Hull emailed Rex Martin, Syngenta's representative to the U.S. Grains Council, stating: "We need to get some indication to growers or [NCGA] that China Viptera approval is done and is only waiting for the administrative signatures . . . David [Morgan] and Chuck [Lee] said growers are starting to return seed and *we need to try to stop this*." Email from Sarah Hull to Rex Martin dated April 10, 2012 (emphasis added).

101.    About a week later, during Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, publicly stated that he expected China to approve Agrisure Viptera® "quite frankly with in the matter of a couple of days."    http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earningscall-transcript.aspx. This, of course, was a year after Syngenta had already sold large quantities of Agrisure Viptera® to farmers across the country.

102.    On information and belief, however, Syngenta did not as of April 2012 have a reasonable basis for a belief that China's approval was "done," or its representation that approval was imminent. Syngenta certainly did not have any sort of official approval at this juncture.

103.    Indeed, Syngenta received a rejection and deficiency letter from China's Ministry of Agriculture on May 15, 2012.

104.    Syngenta also distributed misleading written materials indicating that Agrisure Viptera® *could* be exported to China.

105.    For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Agrisure Viptera®. In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates." However, applying for shipment-specific Bio-Safety Certificates was and is pointless because MIR162 has not been approved for importation in China.

106.    Syngenta knew that its Request for Bio-Safety Certificates Forms was pointless but distributed it in an effort to mislead U.S. farmers.

107.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contains deceptive statements regarding the importance of China as an export market. http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf. For

23

example, the "Plant with Confidence Fact Sheet" states:

> The vast majority of corn produced in the U.S. is used domestically. There is a misconception that China imports more grain than it actually does from the U.S. China has imported, on average, a little more than half of one percent − 0.5% − of all U.S. corn produced in the past five years. . . .
> Since very few U.S. grain outlets actually export to China, most have no reason to restrict your right to plant the latest technologies.

http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf (emphasis removed).

108.    Contrary to the Plant with Confidence Fact Sheet, the NGFA reports:

> The U.S. Department of Agriculture (USDA) forecasts that China will become the world's largest corn importer by 2020. China is projected to increase its corn imports to 22 million metric tons (866 million bushels) by 2023, up from 2.7 million metric tons (106 million bushels) in 2012. For 2013, USDA had projected that the United States would export 37 million metric tons (1.457 million bushels) of corn, and that China would import an estimated 7 million metric tons (276 million bushels) – virtually all of it from the United States.

http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into-U.S.-Export-Markets.pdf.

109.    In other words, for 2013, the USDA estimated that China represented nearly 20% of the U.S. export market.

110.    Prior to China's discovery in November 2013 of MIR162 in U.S. corn shipments, China was the third largest market for U.S. corn and China's share of our market was projected to grow substantially. China is by far the largest potential growth market for U.S. corn.

***Syngenta Continued To Expand Sales Of Agrisure Viptera® Acreage Despite No Approval from China And While The Importance Of The Chinese Market Continued To Increase:***

111.    China continued to be a major and growing market for U.S. corn and corn products during the 2012 and 2013 crop years.

112.    However, during that period, China still had not yet approved the import of MIR162. Syngenta was still in the approval process, and correcting deficiencies identified by the Ministry of Agriculture. It had no assurance that approval would be conferred by the 2013 crop year. In fact, as of October 2013, Syngenta was still completing required research for its application.

113.    Corn industry groups continued to object to Syngenta Seeds' commercialization of Agrisure Viptera®.

114.    In fact, during 2012/13, China had become the third largest export market for U.S. corn. As reported by the Iowa Corn Growers Association, "[i]n 2012/13, China was the third largest export market for U.S. corn and up until the recent issue [the rejections beginning in November 2013] [China] was on track to meet or exceed that position." China and MIR162, 2-2014, Iowa Corn Growers Association, Feb. 6, 2014.

115.    Nevertheless, Syngenta continued to market Agrisure Viptera® during the 2012 and 2013 crop years.  Estimates were that during this period, Syngenta had increased the market share of its Agrisure Viptera® corn to well more than 2%, and, by some estimates, as high as 3.5%, of the corn area grown in the U.S.  Christensen, "Viptera Could Have Been Approved for Importation Into China, But Was Not," Seed in Context Blog, April 13, 2014 (http://www.intlcorn.com/seedsiteblog/?p=1891).

116.    This increase further assured that Agrisure Viptera® would disseminate throughout the U.S. corn supply and that it could not – and would not – be channeled away from export markets, such as China, which had not approved MIR162.

***Regulation, Testing and Deregulation Of Event 5307:***

117.    On April 22, 2011, just months after Syngenta Seeds had released Agrisure Viptera® for the 2011 crop year, Syngenta Biotech filed with APHIS a petition seeking the deregulation of another insect resistant, genetically modified trait known as Event 5307. Event 5307 was ultimately deregulated by APHIS on January 29, 2013.

118.    Between 2005 and 2011, Syngenta Biotech conducted at least 101 field trials of Event 5307 corn under at least 22 notifications made to APHIS under the GMO Regulations at sites in 23 states.

119.    Upon information and belief, at least some of the field trials of Event 5307 included tests of corn stacked with multiple traits, including the presence of both Event 5307 and MIR162. Further, upon information and belief, field tests conducted under the GMO Regulations of Event 5307, either singly or together with other traits, including MIR162, continued during the period after the filing of the Event 5307 Deregulation Petition and the January 29, 2013 decision to deregulate Event 5307.

120.    In its deregulation petition for Event 5307, Syngenta Biotech disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a standalone product, but intended to combine it with other traits, including MIR162. It also stated that it intended to seek approval of products containing Event 5307 in countries which had functioning regulatory systems and that "Syngenta is also pursuing regulatory approvals for importation of corn commodities and processed goods containing 5307 corn in key export markets for U.S. and Canadian corn" and that applications were currently planned for a number of additional countries, including China. In the discussion of "Adverse Consequences of Introduction," Syngenta Biotech stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or

cumulative impacts on . . . the economy, either within or outside the U.S." Petition for Determination of Nonregulated Status for Rootworm-Resistant Event 5307 Corn, April 22, 2011, at 156 (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

121.    Following approval of Event 5307, Syngenta Seeds announced that it would commercialize its Agrisure Duracade™ for the 2014 crop year containing both Event 5307 and MIR162, despite the continued failure to obtain approval from China for MIR162 and the fact that Event 5307 also had not been approved.

**Commercialization Of Agrisure Duracade™ Despite MIR162's Continued Disruption Of The U.S. Corn Trade:**

122.    In November 2013, China began rejecting shipments of U.S. corn which tested positive for the presence of MIR162. Syngenta has, nevertheless, continued its false statements and misrepresentations, as alleged herein, including through its decision to market for the 2014 crop year Agrisure Duracade ™.

123.    The National Grain and Feed Association has detailed the disastrous results of China's rejection of U.S. corn based upon the presence of MIR162:

> This development resulted in a series of trade disruptions – including testing; delays in vessel discharge; and deferrals, diversion and rejections of cargoes – when MIR162 subsequently was detected in U.S. shipments of corn and distillers dried grains with solubles (DDGS). These disruptions effectively shut U.S. corn farmers out of China's feed grain import market, which previously almost exclusively had been supplied by the United States. **China subsequently has taken actions to utilize domestic, as well as international alternatives to U.S. corn. For instance, China's imports of U.S. grain sorghum have increased significantly. China also has sourced corn from Ukraine. And most recently, Brazil and Argentina each were granted approval to begin exporting corn to China. . . .**
> This disruption, tied to positive detections of MIR 162 that began in November 2013, has virtually halted U.S. corn trade with China.
> . . . .
> USDA currently is projecting Chinese corn imports will reach 22 mmt [million metric tons] by 2023, which if realized would account for nearly half of the

projected growth in total world corn trade. However, **if the MIR 162-related trade disruption continues, other corn exporting nations, such as Ukraine, are capable of replacing the United States as the principal corn exporter to China**. . . .

[T]he MIR 162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. **The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion**.

http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf (emphasis added).

124.    Syngenta nevertheless moved forward with commercialization of Agrisure Duracade™ for the 2014 planting season.

125.    On January 23, 2014, the National Grain and Feed Association and the National American Export Grain Association issued another Joint Statement imploring Syngenta to stop its heedless and irresponsible commercialization:

On Jan. 22, 2014, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) sent a letter to Syngenta asking the company to immediately halt commercialization in the United States of its Agrisure Viptera® corn and Agrisure Duracade™ corn until such time as China and certain other U.S. export markets have granted required regulatory approvals/authorizations.

The NGFA and NAEGA . . . are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.

There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the

United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.

Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy.

U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta-Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf (emphasis added).

126.    Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now **would have no effect on grain in the system** or Chinese acceptance of corn imports." Reuters, "U.S. Groups urge Syngenta to hold back on GM corn barred by China" (Jan. 23, 2014) (emphasis added).

127.    This pronouncement recognizes that indeed, MIR162 has contaminated the U.S. corn supply to an extent that it cannot be undone. This is even more true given that Syngenta continues to market and sell Agrisure Duracade™ in addition to Agrisure Viptera®.

128.    In March 2014, in meetings with the NGFA, Syngenta advised that its introductory launch of Agrisure Duracade™ would likely extend to 250,000 to 300,000 acres in a launch zone which included portions of each of the ten (10) states which grow the largest amounts of corn. In the same meetings, Syngenta refused to accept responsibility or liability if and when Agrisure Duracade™ becomes present in countries which had not approved it.

NGFA, Latest News, "Syngenta Provides Additional Details on Plans for 'Introductory launch' of Duracade, Biotech Corn in 2014" (March 7, 2014)

http://www.ngfa.org/2014/2014/03/07/Syngenta-provides-additional-details-on-plans-forintroductory-launch-of-duracade-biotech-corn-in-2014/.

129.    In launching Duracade™, Syngenta stated that growers would be required to sign a stewardship agreement requiring the grower to either feed the corn to livestock or poultry on the farm, or deliver it to a grain handling facility, feed mill, feed lot or ethanol plant not exporting corn or corn co-products to China or the European Union.

130.    The version of the stewardship agreement at launch, and referencing Duracade, did not do so. *See* Syngenta Seeds Inc. Stewardship Agreement (Rev. 6/05/2013). This version is, even now, the agreement Syngenta posts on its website. *See*

http://www3.syngenta.com/country/us/en/agriculture/Stewardship/Documents/SyngentaStewardshipAgreement.pdf.

131.    Syngenta also did not require planting or harvesting protocols, but only made "recommendations" that the grower: (1) select fields for planting Duracade™ surrounded by the grower's own corn fields or planted next to a non-corn field; (2) place signs to notify others that

Duracade™ was planted in the field; (3) plant buffer rows; (4) clean planters; (5) properly dispose of unused seed and return unopened seed units to the seed provider; (6) separately harvest Duracade™; (7) flush the combine; (8) deliver corn containing Duracade™ to a previously arranged delivery point; (9) store Duracade™ in a separate bin on the grower's farm; and (10) clean the bin floor.

132.    Syngenta officials stated that while Syngenta would apprise growers of such "recommendations," it "declined to incorporate the recommendations into the stewardship agreement because they did not want to dictate such practices to producers." National Grain and Feed Association Newsletter Vol. 66, No. 5 dated March 7, 2014 at 2.

133.    Syngenta was and is well aware that such measures are minimally necessary to an adequate stewardship program. Yet Syngenta did not require such measures in connection with either Agrisure Viptera® or Agrisure Duracade™.

134.    The NGFA issued a dire forecast of the damage Agrisure Duracade™'s premature commercialization will cause:

> For the 2014 planting season, Syngenta has introduced another trait called Agrisure Duracade™ 5307 (hereafter referred to as 5307) that currently lacks Chinese import approval, potentially prolonging the U.S. loss of the large, growing Chinese feed grain import market. . . .
>
> China is roughly one year into its semi-regular, two-year process of evaluating the authorization of 5307 for import in food, feed and for further processing. Since Chinese authorization of 5307 is not expected for at least another year, China is expected to continue enforcing a zero-tolerance policy for unapproved biotech-enhanced traits in 2014/15, as occurred in marketing year 2013/14 for MIR 162. Thus, the commercialization in the United States of 5307 is expected to prolong the economic impact on U.S. corn and other commodities that began in mid-November 2013.
>
> Similarly to 2013/14, when the United States lost access to the Chinese corn import market, the 2014/15 market price impact caused by the presence of 5307 in U.S. commodity exports is expected to extend beyond the corn market and potentially affect other commodities, such as DDGS, soybean meal and soybeans,

because of the substitutability of corn for these commodities in domestic feed rations. . . .

[A]fter accounting for projected benefits and costs, the net economic impact of the 5307 commercial launch is estimated to result in a loss to the U.S. grain value chain ranging from $1.2 billion to $3.4 billion, with a mid-point estimated net economic loss of $2.3 billion.

http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-Analysis.pdf (emphasis in original).

135.    In March 2014, Syngenta pulled Agrisure Duracade™ from the Canadian market for the 2014 growing season because China and the European Union had not yet approved MIR162.

136.    Syngenta said in a notice to Canadian growers: "While the vast majority of the Canadian corn crop is typically directed to domestic markets in North America, some corn may be destined for these markets." Reuters, "Syngenta halts sales of new GMO corn seed in Canada" (Mar 10, 2014). "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end-market destination requirements." *Id.*

137.    As illustrated by the statements of its own representatives and this action, Syngenta knew that China was and is a key corn importer and that responsible management requires that its approval be obtained before commercialization of a bio-engineered corn trait.

138.    As further illustrated, Syngenta knows how to withdraw an unapproved GM trait from the market when it wants to do so.

139.    Nevertheless, Syngenta continued, and continues, to market and sell MIR162 corn in the United States.

140.    Compounding its irresponsibility, Syngenta then decided to commercialize Agrisure Duracade™ in 2014, even though it contains MIR162, and *also* contains another genetic trait, Event 5307, not approved by China or other major purchasers of U.S. corn.

141.    In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season. MIR162 was in 23 new Agrisure Viptera® products and 18 new Agrisure Duracade™ products. *See* "Syngenta Announces 52 New Corn Hybrids for 2015 Season," Sept. 17, 2014 (http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015¬season-275494841.html)

142.    In December 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta already had begun commercializing yet another GMO corn seed product as discussed above. In addition, China's December 2014 approval is not likely to lessen the impact of Syngenta's conduct anytime soon.

143.    Syngenta affirmatively and purposefully engaged in all the actions and inactions described above in order to increase its own profits, ignoring the tremendous risks its profit driven strategy imposed upon U.S. corn farmers and others.

144.    Syngenta knew, or should have known, prior to its commercialization of Agrisure Viptera® and at all times since then of the high likelihood that Agrisure Viptera®, would contaminate the U.S. corn supply and that channeling in the circumstance of its clearly inadequate "stewardship" program would not work. As such, it was inevitable that Viptera® corn would move into export channels, including China, and cause trade disruption, as Syngenta well knew.

145.    Syngenta's acts and omissions have resulted in the pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport,

causing physical harm to plaintiffs' corn, harvested corn, equipment, storage facilities, and land.

146.    The likelihood that Agrisure Viptera® -- and Duracade™ -- would (and will continue to) contaminate the U.S. corn supply was readily foreseeable to, and indeed foreseen by, Syngenta, as was the harm to corn farmers, who Syngenta describes as among its stakeholders "affected by" Syngenta's business.

147.    Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Agrisure Viptera® and Duracade™, as well as the extent to which adequate containment measures would be required of its customers. Syngenta also could have instituted channeling measures but did not. Syngenta also ignored repeated warnings from stakeholders and misrepresented and concealed material information, all to further its own profit.

148.    Syngenta did not simply fail to take precautions against foreseen and at minimum, clearly foreseeable harm, but acted affirmatively to create it.

149.    Syngenta's conduct has directly caused and contributed to cause significant economic harm to farmers and other participants in the corn industry as explained below.

***Economic Impact:***

150.    The characteristics of the world corn market have important implications for understanding the market price impact of the Chinese MIR162 ban on corn and corn products from the United States. Those include:

    a.    Corn is the most widely used feed grain in the world.

    b.    The United States is by far the largest producer and exporter of corn.

    c.    Prior to the import ban, virtually all of China's corn imports were from the United States.

    d.    Prior to the import ban, China was the third largest market for U.S. corn exports.

e.    The latest U.S. Department of Agriculture (USDA) agricultural trade projections placed China as becoming the world's largest importer of corn by 2020.

f.    The MIR162 import ban virtually halted U.S. corn sales to China indefinitely.

g.    The world price of corn is established in Chicago and the loss of a key market for the U.S. puts downward pressure on the world price that reverberates to farmgate prices throughout the United States.

h.    Corn is a commodity and a relatively small change in the global volume of trade in a commodity market like corn will have a magnified price impact.

i.    An exporter's reputational loss in an agricultural commodity market due to an event like a GMO contamination can persist for many years. Once an exporter has lost a foreign market, it is difficult to get it back.

***Global Corn Market:***

151.    World corn production totaled 983.3 million metric tons (mmt) in 2013/14 (about 38.7 billion bushels). This supply was concentrated in a relatively small number of countries. The world's largest corn producers are the United States with about 36% of global production in 2013/14, China (about 22% of production), Brazil (8%), and the EU (7%).

152.    Global usage of corn has expanded by about 37% in the last decade, due to rising population and incomes, and increased urbanization with its associated changing dietary patterns. Feed usage accounts for about 58% of total global corn use, industrial use 27%, and food 11%.

153.    At the end of each crop year, corn inventories are carried forward in case of a short harvest. The United States and China are the largest holders of corn inventories. At the end of 2013/14, these two countries held 70% of the 176 mmt of global stocks.

154.    Total world corn trade is about 100 to 120 mmt per year. Prior to the MIR162 ban, China was importing about 4% of global corn sales. That amount was projected by the

USDA to increase substantially by 2020, when the USDA projects that China will be the world's largest importer of corn at 16 million metric tons.

155.    The United States is the dominant exporter of corn. The big exporters include the U.S. (36% of world trade), Brazil (20% of exports), the Ukraine (17%), and Argentina (10%).

156.    Just over 10 years ago China was a significant exporter of corn (as well as all grains), with exports peaking at 15.2 million metric tons in 2002/03. China flipped from being a corn exporter to a corn importer in 2009/2010.

157.    China turned from a net exporter to a net importer of grains in 2008. Imports of grains (including corn) surged during the 2012-13 time period, reaching 18 mmt. Most of this grain originated from the United States.

158.    The import side of the international trade equation is more diverse, with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China and Turkey (together accounting for 55% of imports in 2013/14). This leaves 45% of the corn imports destined for a large number of small importers.

***Major Corn Importers*:**

159.    In its annual long-term grain trade projections, released in February 2014, the U.S. Department of Agriculture projected that China's corn imports would grow from 2.7 mmt in 2012/13 to 22 mmt in 2023/24. China is by far the largest potential growth market for U.S. corn. These projections place China as the largest corn importer in the world by 2020.

***U.S. Corn Market:***

160.    Corn is the largest crop in the United States, measured either by value of production or planted acres. In the 2013/14 September-August fiscal year, U.S. corn growers produced about 13.9 billion bushels of corn, worth more than $60 billion. Corn is used for

livestock (primarily cattle, hogs, and chickens) feed (37% of 2013/14 crop), food, alcohol and industrial usage (46% of the 2013/14 crop) and exports (14% of the 2013/14 crop). U.S. Department of Agriculture, Economic Research Service, Feedgrains Yearbook, Table 4, http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo.

161.    Corn production in the United States is concentrated in the neighboring Midwestern states comprising the "corn belt," where soil and climatic conditions are highly conducive to growing corn. [1]About 95.4 million acres were planted in corn in the United States in the September-August 2013/14 marketing year.

162.    Corn prices throughout the United States are tied to the Chicago Board of Trade Futures (CBOT) price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient. Basis levels for spatially separated markets are also closely linked. Events like trade disruptions that affect the CBOT corn prices directly affect the price that U.S. corn farmers receive for their corn.

*China's Corn Market:*

163.    China has emerged as a large player in the global market for agricultural products. As of 2012 it was the fourth largest exporter and second largest importer of agricultural products in the world, according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix, and changing consumer diets with rising incomes and urbanization. The changing diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains including corn and distillers' dried grains with solubles (DDGS), a byproduct of corn ethanol production, and soybeans.

---

[1] There are alternative definitions of exactly which states make up the "corn belt." The top ten producing states are Iowa, Illinois, Nebraska, Minnesota, Indiana, South Dakota, Wisconsin, Kansas, Ohio, and Missouri.

164.    China is the now largest foreign market for U.S. agricultural products. The U.S. Department of Agriculture (USDA, Outlook for U.S. Agricultural Trade, AES-83, August 28, 2014) reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in fiscal Oct. 2013-Sept. 2014.

165.    Prior to the U.S. corn import ban, the top three U.S. agricultural exports to China (in order of importance) were soybeans, cotton, and corn, based on value of trade. In November 2013, China started turning back cargoes containing Syngenta's MIR162 biotech corn. While MIR162 is now approved, Event 5307 is not.

166.    U.S. corn exports to China reached 5.146 mmt in 2011/12 (approximately 13% of U.S. exports that Sep-Aug marketing year) and were 2.39 mmt in 2012/13–still about 13% of exports (lower export volume due to the big U.S. drought). By contrast, due to the China import ban of U.S. corn beginning in November 2013, the absolute volume of U.S. corn exports to China in 2013/14 was not much higher than the drought year, and fell to less than 6% of exports. If the current trend that began after November 2013 continues, U.S. corn exports to China in 2014/15 and beyond will be negligible.

167.    If access to the China market continues to be denied to U.S. corn imports, the losses will be even more significant and will continue to grow.  As the following quote explains, China was expected to be a very rapidly growing import market for corn.

> "China's corn imports are projected to rise steadily and reach 22 million tons by 2023/24. China's strengthening domestic demand for corn is driven by structural change and growth in its livestock sectors, as well as by rising industrial use. The increase in China's imports accounts for nearly half of the projected growth in world corn trade." USDA Long-Term Projections Feb. 2014, p. 20.

USDA Agricultural Projections to 2023, www.usda.gov/oce/commodity/projections/.

168.     For fiscal year 2013/2014 China was expected to import 7 mmt of corn and 6 mmt in 2014/15. Since the news of the rejected cargoes surfaced, U.S. Department of Agriculture analysts have lowered projections of China's total annual imports from 7 to 3.5 mmt in 2013/14 and from 6 to 3 mmt for 2014/15. These projections obviously reflect the assumption that U.S. corn trade with China will begin again sometime in 2014/15. If that does not occur, the actual imports will be far lower than the projected imports. The damage to the U.S. corn market and the prices U.S. corn farmers receive for their corn likely will be long lasting.

169.     To make up for reduced imports from the U.S., China has increased imports from the Ukraine and there are reportedly small shipments from Brazil and Argentina. In other words, the U.S. is already beginning to lose China as an important corn export market. If the import ban continues, it will be increasingly difficult to get it back.

*GMOs in China:*

170.     China imports more biotech soybeans than any other country. This marketing year China is expected to import 72 mmt of soybeans. The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the United States, Brazil and Argentina.

171.     China has approved five-biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets. Approximately 15 different corn biotech products have been approved by China, including "events" developed by Monsanto, Syngenta, Bayer, and Du Pont. The number of approved soybean products is approximately 8 and there are 6 cotton and 7 canola products. Only 1 sugar beet product has been approved.

172.    China started testing and rejecting cargoes of U.S. corn in November 2013 and subsequently began rejecting U.S. distiller's dried grains with solubles (DDGS)–a corn ethanol by-product–imports in June or July 2014.

173.    By mid-December 2013, China had rejected shipments of U.S. corn totaling 545,000 metric tons. *See* http://www.reuters.com/article/2013/12/20/china-cornidUSL3N0JZ0EZ20131220. China also rejected 2,000 metric tons of U.S. distiller's dried grains with solubles (DDGS), a corn ethanol by-product, imports in December 2013, and continued rejecting DDGS through 2014. *See* http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

174.    Beginning in July 2014, China's General Administration of Quality Supervision, Inspection and Quarantine announced that it would require official government certification from the point of origin that shipments DDGS are free of MIR162. DDGS are used in livestock feed rations primarily as an energy source. China's rejection of U.S. DDGS due to the presence of MIR162 has important – and negative – implications on the price of U.S. corn.

***DDGS Trade:***

175.    U.S. DDGS exports to China totaled 2.16 mmt in calendar year 2012 and 4.45 mmt in calendar year 2013. DDGS trade has been hit hard recently, but the extent of the impact on corn prices may not show up in the trade data yet.

***U.S. Exports of Corn and DDGS to China: 2009-2013 (calendar years):***

176.    China was by far the largest market for U.S. DDGS exports, accounting for approximately 50% of all exports. The U.S. exports over 20% of annual DDGS production. http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

40

177.    The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, pushing corn prices down further.

178.    DDGS are an important source of revenue for US ethanol plants. Lower DDGS prices due to the loss of the Chinese market have negatively affected ethanol crush margins. The corn crush spread is a dollar value quoted as the difference between the combined sales values of the products (ethanol and DDGS) and the cost of corn. China's ban has lowered DDGS prices and therefore lowered the DDGS value per bushel of corn processed by the ethanol producers. This may be partially offset by a lower price of corn due to the ban. However, USDA (USDA, AMS, Bioenergy Market News Reports) figures on ethanol crush margins indicate the difference between corn price and value of co-products was $3.67 per bushel on May 2, 2014 and then fell to $2.28 per bushel on September 26, 2014. The value of DDGS per bushel of corn processed into ethanol was $2.08 on May 2nd this year, compared to only $1.02 on September 26, 2014. About 4.7 billion bushels of corn are used for ethanol annually, so the financial loss to the ethanol industry from the MIR162 ban is significant.

179.    The impact of the loss of the Chinese market for corn and corn products to U.S. corn farmers likely will be long lasting. The MIR162 incident has similarities to other international GM contamination incidents, which have had long-lasting market effects. For instance, 8 years after the 2006 Bayer Crop Science's Liberty Link contamination of the U.S. long-grain rice supply, exports to Europe have yet to recover.  Prior to the 2006 marketing year the EU-27 procured approximately 25% of its rice imports from the United States. Immediately after the contamination event, the EU blocked imports of any new commercial U.S. long-grain rice imports. In fact U.S. long grain rice farmers lost one of their most important markets and they have yet to get it back despite considerable effort and expense. Recently, an official

41

delegation from the U.S. rice industry visited countries in the EU (such as Germany and the United Kingdom) where they held discussions focused on the re-introduction of U.S. rice into this important market. After this visit, the USA Rice Federation reported that market re-entry faces significant hurdles:

> "The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price committee." USA Rice Federation, *USA Rice Daily*, Tuesday October 14, 2014.

180.    In commodity markets like corn, a relatively small change in trade volume can have a significant impact on price. One of the prime examples of the operation of this basic law of economics occurred in 1973 when Middle Eastern Arab oil producers (Iran and Arab members of OPEC) cut off exports to the U.S. to protest American military support for Israel. Even though imports from this region accounted for only about 10% of the U.S. oil supply, petroleum prices quadrupled in response to the export embargo and there were long lines for gasoline at filling stations.

181.    Another more recent example of inelastic demand at work is evident from the world coffee market. Brazil produces about 35% of the world's coffee and is unfortunately in the middle of a drought that is affecting both the 2014 and 2015 coffee harvests in that country. In 2014 the Brazilian coffee harvest was down about 13% and this doubled the price of coffee. World coffee production is about 150 million bags per year and as the following quote from the *Financial Times* indicates, a 10 million bag swing in Brazil's production over a two year period (about a 3.5% change in production) can mean the difference in coffee prices ranging between $3 and $1.50 per pound.

"Brazil is the largest coffee producer in the world, accounting for about 35 per cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and $1.50 per pound of coffee." *Financial Times*, Wednesday, Sep 17, 2014.

182.     Based on the same economic logic, the *Wall Street Journal* reasoned that the loss of the Chinese corn market to the U.S. industry over MIR162 will have an important impact on the U.S. corn price even though that market represented only about 12% of U.S. exports.

"Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices." *Wall Street Journal*, April 11, 2014, U.S. Corn Exports to China Dry Up Over GMO Concerns.

183.     In the U.S. corn market, both domestic demand and supply curves are relatively inelastic, especially in the short run. Elasticity measures the degree of responsiveness in supply or demand to price changes. If both the supply and demand curves are inelastic, then for each curve it will take a relatively large change in price to effect a change in quantity demanded or supplied.

184.     Under the bedrock economic law of supply and demand, for an exportable good, when there is less foreign demand for a product, particularly one with a relatively inelastic demand and supply curves, the price is lower than it otherwise would be.

185.     As a result, all U.S. corn farmers who priced their corn after November 2013 have received a lower price for their corn than they would have received if China's imports of U.S. corn had not effectively stopped.

***Allegations:***

186.     Plaintiff brings this action , as a producer. "Producer" is defined as an owner, operator, landlord, waterlord, tenant, or sharecropper, who shares in the risk of producing corn

and who is entitled to share in the corn crop available for marketing from the farm, as reflected in FSA Form 578.

187.    Plaintiff priced its corn for sale after November 18, 2013.

## CLAIMS FOR RELIEF
### Count I - Lanham Act

188.    Plaintiff incorporates by reference Paragraphs 1-187 as though fully alleged herein.

189.    The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

a. Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

190.    Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding MIR162,

the timing of its approval by China, its impact on export markets for U.S. corn, including China, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

191. Syngenta's representations, statements, and commentary have included:

a. To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

b. To APHIS and the public that MIR162 could and would be channeled away from markets which had not yet approved MIR162;

c. To the press and to investment analysts on quarterly conference calls;

d. Through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet; and

e. Through other statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

Each as more fully alleged above, are materially false statements that misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of MIR162 corn, the timing of its approval by China, the impact of MIR162 corn on the export markets, including China, for U.S. corn, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

192. Syngenta's misleading representations of fact relating to the U.S. corn export market, and particularly in relation to China's position as a major export market, also misrepresented to, and deceived and/or continue to deceive, farmers and other consumers. Syngenta's "Plant With Confidence" fact sheet has, and misrepresented, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual

basis, among other facts.

193.     Syngenta's misleading representations of fact also include the statements in the MIR162 Deregulation Petition as more fully set forth above, including in paragraph 127-132.

194.     Additionally, Syngenta's representations misrepresented, and deceived and/or continue to deceive, farmers, other consumers and stakeholders as to the status of approval for distribution of MIR162 corn in China, a major export market.

195.     Syngenta's MIR162 corn products were misrepresented, and caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

196.     Syngenta's statements were made in commercial advertising or promotion for MIR162 corn products, including Viptera® and Duracade™.

197.     Syngenta had an economic motivation for making its statements, as Syngenta was incentivized to sell its MIR162 corn products.

198.     Syngenta's statements were likely to influence purchasing decisions by domestic corn producers.

199.     Syngenta's statements were widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

200.     Thus, Syngenta's misleading representations and statements are and/or were material.

201.     Syngenta's products travel or traveled in interstate commerce.

202.     Plaintiffs have and continue to be damaged by Syngenta's material misrepresentations. Plaintiffs were injured and/or continue to suffer injury to, among other things, their property and possessory rights in the corn they have grown, as well as the negative

market price impact explained above, which results in lower revenues and profits. Those economic injuries are likely to continue in the future.

203.   Plaintiff's damages were proximately caused by Syngenta's misleading representations as described herein.

204.   Syngenta's representations, statements and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the plaintiffs, other corn producers and stakeholders.

205.   Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiff to recover damages, the costs of this action, and, because this case is exceptional, reasonable attorneys' fees.

## Count II - Violation of Minn. Stat. §§ 325D.13 and 325F.69

206.   Plaintiff incorporates by reference Paragraphs 1-187 as though fully alleged herein.

207.   Syngenta made false or misleading statements regarding MIR162 and its impact on export markets for U.S. corn, including China, and corn prices.

208.   Syngenta's representations, statements and commentary have been largely disseminated, and included:

a. To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China.

b. To APHIS and the public that MIR162 could and would be channeled away from markets which had not yet approved MIR162.

47

c. To the press and to investment analysts on quarterly conference calls.

d. Through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet.

e. Through other statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

209.    In addition, Syngenta stated in 2007 that its regulatory filings with China were "in process" when it did not actually file for approval from China until 2010.

210.    Syngenta made numerous misrepresentations pertaining to the status of China's import approval for MIR162. Among others, and as more fully set forth above, Syngenta during the summer of 2011, represented to stakeholders, including growers (to encourage further sales, planting and harvesting of MIR162), that it would receive China's approval in March 2012. Syngenta continued making this misrepresentation throughout the planting and harvesting season in 2011 and into 2012. On April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, stated that he expected China to approve Agrisure Viptera® "quite frankly within the matter of a couple of days." Based upon Syngenta's knowledge of the Chinese regulatory process, and its own status within that process for MIR162, Syngenta knew this representation was false and/or made this representation recklessly and willfully without regard to its consequences.

211.    In addition to these false and misleading statements, Syngenta failed to disclose, and actively suppressed and concealed, that approval from China was not expected or reasonably likely to occur for (at least) the 2011 or 2012 growing seasons and that purchase and planting of Viptera® created a substantial risk of loss of the Chinese market.

212.    Syngenta also has at all times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

213.    Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Agrisure Viptera® or Duracade™.

214.    As a developer of genetically modified products (including MIR162), Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its application for foreign approvals to which corn farmers, including plaintiffs, do not have access.

215.    Syngenta also has special knowledge regarding the systems it did and did not institute for isolation and channeling of its genetically modified products, including Agrisure Viptera® and Duracade™, which was not available to corn farmers, including plaintiffs.

216.    Syngenta knew but failed to disclose, suppressed and concealed that systems were not in place for either isolation or effective channeling of Agrisure Viptera® and Duracade™ and that absent robust isolation practices and effective channeling, it was virtually certain that Agrisure Viptera® or Duracade™ would disseminate throughout the U.S. corn supply and into export markets, including China, which had not approved import, causing market disruption.

217.    Syngenta also knew but failed to disclose, suppressed and concealed, at minimum, in 2010-2011 that it would not have import approval from China by the 2011 crop year and in 2011-2012 that it would not have import approval from China by the 2012 crop year, and failed to disclose that China was a significant and growing import market. Syngenta further failed to disclose at all relevant times the insufficiency of its approval request to China, and that it sought approval cultivate MIR162 in China, both of which Syngenta knew would cause delay in China's approval process for MIR162. Syngenta also failed to disclose, and suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of

Agrisure Viptera® or Duracade™ and the very high likelihood that MIR162 would move into export channels where it was not approved, causing market disruption.

218.    Syngenta engaged in these deceptions in order to sell and increase its sales of Viptera® and Duracade™, despite Syngenta's further knowledge that the more acres grown with them, the more likely it would be that Agrisure Viptera® and Duracade™ would disseminate into the U.S. corn supply and farmers would be harmed.

219.    Syngenta knew that farmers like plaintiffs here are affected by its business and depend on it for responsible commercialization practices.

220.    For all these reasons, Syngenta had a duty to disclose the truth – that import approval from China (a key market) was not imminent or indeed anticipated for (at least) the 2011 and 2012 growing seasons, that there was not an effective system in place to channel Agrisure Viptera® and Duracade™ away from China (or other foreign markets) from which Syngenta did not have approval, and that purchase and planting of Viptera® (and later Duracade™) created a substantial risk of loss of the Chinese market and/or prolonging the loss of that market.

221.    In addition, Syngenta made numerous misrepresentations to the effect that approval from China was on track and/or would be received during time periods when Syngenta knew it would not, and that Agrisure Viptera® and Duracade™ could, and would, be channeled away from markets for which approval had not been obtained. Syngenta had a duty to prevent words communicated from misleading others.

222.    Syngenta's misrepresentations and omissions were made intentionally or recklessly.

223.    Syngenta, in connection with the sale of merchandise – Viptera® and Duracade™ -- knowingly misrepresented, directly or indirectly, the true quality of that merchandise in violation of Minn. Stat. § 325D.13.

224.    Syngenta used or employed fraud, false pretense, false promise, misrepresentation, misleading statements or deceptive practices, with the intent that others rely thereon in connection with the sale of Agrisure Viptera® and Duracade™, in violation of Minn. Stat. § 325F.69.

225.    Syngenta's violations of Sections 325D.13 and 325F.69 proximately caused harm to Plaintiffs.

226.    This action will serve a public benefit. Not only were Syngenta's misrepresentations made to a large segment of the public, Syngenta's conduct vitally affects a large segment of the public as well – all farmers and others in the business of selling corn and corn products – who depend on the responsible stewardship practices of developers like Syngenta when commercializing GM products. The issues surrounding what duties and liabilities such developers have for irresponsible and intentional acts is not limited to corn but impact all developers and stakeholders in similar position.

227.    Plaintiffs are entitled to compensatory damages and attorneys' fees (*see* Minn. Stat. § 8.31, subd. 3a).

### Count III – Negligence

228.    Plaintiff incorporates by reference Paragraphs 1-187 as though fully alleged herein.

229.    Syngenta owed a duty of at least reasonable care to its stakeholders, including Plaintiff in the timing, scope, and terms under which it commercialized MIR162.

230.    Syngenta breached its duty by acts and omissions including but not limited to:

a. Prematurely commercializing Agrisure Viptera® and Duracade™ on a widespread basis without reasonable or adequate safeguards;

b. Instituting a careless and ineffective "stewardship" program, which ensured contamination of the U.S. corn supply;

c. Failing to enforce or effectively monitor its stewardship program;

d. Selling Agrisure Viptera® and/or Duracade™ to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channeling" those products;

e. Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risk that growing Viptera® would lead to loss of the Chinese market;

f. Distributing misleading information about the importance of the Chinese market; and

g. Distributing misleading information regarding the timing of China's approval of Agrisure Viptera® and/or Duracade™.

231.    Syngenta's negligence is a direct and proximate cause of the injuries and damages sustained by Plaintiff.

232.    The Plaintiff is thus entitled to an award of compensatory damages, prejudgment and post-judgment interest.

233.    Syngenta's conduct was willful, wanton, and in reckless disregard for the rights of others, including the Plaintiff and punitive damages are thus warranted.

**Count IV - Trespass to Chattels**

234.    Plaintiff incorporates by reference Paragraphs 1-187 as though fully alleged herein.

235.    By commercializing Agrisure Viptera® and/or Duracade™ prematurely and without adequate systems to isolate and channel it, Syngenta intentionally intermeddled with and

brought Agrisure Viptera® and/or Duracade™ into contact with non-Agrisure Viptera/Duracade corn in which the Plaintiff had possession and/or possessory rights.

236.    Syngenta knew that its conduct would, to a substantial certainty, bring Agrisure Viptera® and/or Duracade™ into contact with plaintiff's corn through contamination in fields and/or in grain elevators and other modes of storage and transport.

237.    As a result of the trespass, these plaintiffs' chattels were impaired as to condition, quality or value, and plaintiffs were damaged.

238.    Plaintiff is thus entitled to an award of compensatory damages and prejudgment and post-judgment interest.

239.    Syngenta's conduct was willful, wanton, and in reckless disregard for the rights of others, including the Plaintiff.  Punitive damages are thus warranted.

**Count V - Illinois Consumer Fraud and Deceptive Business Practices Act**

240.    The Illinois Plaintiffs incorporate by reference Paragraphs 1-187 as though fully alleged herein.

241.    Corn seed such as Agrisure Viptera® and Agrisure Duracade™ is an object, good, and/or commodity constituting merchandise pursuant to 815 Ill. Comp. Stat. 505/1.

242.    Syngenta engaged in numerous unfair acts or practices in the timing, scope, and terms under which it commercialized Agrisure Viptera® and Agrisure Duracade™ including:

a. Prematurely commercializing Agrisure Viptera® and Agrisure Duracade™ on a widespread basis without reasonable or adequate safeguards;

b. Instituting a careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor its "stewardship" program;

d. Selling Agrisure Viptera® and Agrisure Duracade™ to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channel" those products; and

e. Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risk that planting Viptera® would lead to loss of the Chinese market.

243.    Syngenta's practices, as set forth above, were unfair in that:

a. The practices offend public policy in that they were done negligently, were done in a manner that brought Agrisure Viptera® and/or Agrisure Duracade™ in contact with the Illinois Plaintiffs' corn thereby resulting in a trespass to chattels, and/or violated industry recognized stewardship obligations;

b. The practices were immoral, oppressive and unscrupulous in that they imposed no meaningful choice on corn farmers, imposed an unreasonable burden on the corn farming industry and was so oppressive as to leave corn farmers with little alternative but to submit to the practices. Corn farmers had no control over the closure of the Chinese market due to the commercialization of Agrisure Viptera® and Agrisure Duracade™; had no reasonable ability to prevent Agrisure Viptera® and Agrisure Duracade™ from entering onto their land, into their corn or into the corn  market, and had no reasonable ability to separately channel their corn and Agrisure Viptera® and Agrisure Duracade™; and

c. The practices caused substantial injury to corn farmers in that it caused the loss of the Chinese export market and reduced corn prices. Corn farmers cannot reasonable avoid the injury caused by Syngenta's actions because the actions have caused a drop in the price for all U.S. corn.

244.    Syngenta's unfair practices and conduct was directed toward consumers of Agrisure Viptera® and Duracade™ as well as other corn producers. Syngenta intended consumers of Agrisure Viptera® and Duracade™ as well as other corn producers to rely on its acts and practices in commercializing and selling Agrisure Viptera® and Duracade™ as being done in a manner that would avoid negatively impacting corn export markets.

245.    Syngenta's unfair practices occurred during the course of conduct involving trade or commerce, specifically the commercialization and sale of Agrisure Viptera® and Duracade™.

246.    Illinois corn producers incurred damages due to the loss of the Chinese import market and resulting drop in the price of corn due to Syngenta's unfair acts and practices.

247.    The loss of the Chinese import market and resulting drop in corn prices was directly and proximately caused by Syngenta's unfair acts and practices.

248.    Syngenta's conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

a. Syngenta's acts and practices in commercializing and selling Agrisure Viptera® and Duracade™ corn were directed to all corn farmers generally; and

b. Syngenta's acts and practices otherwise implicate consumer protection concerns including, but not limited to, not unreasonably risking the availability and welfare of corn export markets or minimizing the potential for unwanted comingling of crops.

249.    Illinois Plaintiffs are authorized to bring a private action under the Illinois Consumer Fraud and Deceptive Businesses Practices Act pursuant to 815 Ill. Comp. Stat. 505/10(a).

250.    Syngenta's conduct was willful and intentional and done with evil motive or reckless indifference to the rights of others. Punitive damages are thus warranted.

251.    Reasonable attorneys' fees and costs should be awarded pursuant to 815 Ill.Comp. Stat. 505/10a.

## **DEMAND FOR JUDGMENT**

Plaintiffs demand judgment from Defendants for:

(a)     All monetary and compensatory relief to which they are entitled and will be entitled at the time of trial;

(b)     Punitive damages;

(c)     Attorneys' fees;

(d)     Prejudgment interest and post-judgment interest at the maximum rates allowed by law;

(e)     The costs of this action; and

(f)    Such other and further relief as is appropriate.

Respectfully submitted,


/S/ KERRIANNE L. WATERS                    /S/ M. MICHAEL WATERS
ARDC #6317967                              ARDC # 3123709
Vonachen, Lawless, Trager & Slevin         Vonachen, Lawless, Trager & Slevin
456 Fulton Street, Ste. 425                456 Fulton Street, Ste. 425
Peoria, IL 61602                           Peoria, IL 61602
P: (309) 676-8986 (O)                      P: (309) 676-8986 (O)
F: (309) 676-4130                          F: (309) 676-4130
kwaters@vltslaw.com                        mwaters@vltslaw.com


/S/ MICHELLE R. EGGERT
ARDC # 6225976
Vonachen, Lawless, Trager & Slevin
456 Fulton Street, Ste. 425
Peoria, IL 61602
P: (309) 676-8986 (O)
F: (309) 676-4130
mreggert@vltslaw.com